UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHELLEY DEVER,

    Plaintiff,

  v.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY

    Defendant.

No. 2:24-cv-02435-DJC-JDP

<u>ORDER</u>

  Plaintiff Shelley Dever brought the instant action against Defendant Lincoln National Life Insurance Company for terminating her long-term disability benefits under her employer's employee benefits plan.  Defendant funded a group Policy, which insured the Plan and is covered by the Employee Retirement Income Security Act ("ERISA").  Plaintiff seeks a reversal of Defendant's decision to terminate her LTD benefits, a reinstatement of benefits from the date of termination through the date of judgment, and an award of prejudgment interest at the statutory rate.

  Each party now moves for judgment in its favor on Plaintiff's claims under Federal Rule of Civil Procedure 52.  Pursuant Rule 52, the Court conducts a bench trial on the record.  In accordance with the Parties' request, the Court ordered the matter submitted without a hearing.  Having read the papers filed by the Parties, carefully

1

considered their arguments and the relevant legal authority, and the Court GRANTS Plaintiff's Motion for Judgment and DENIES Defendant's Motion for Judgment.

## FINDINGS OF FACT

### I.      Plaintiff's Occupation and Disability Policy

Plaintiff is a former employee of Dignity Health, where she worked as a Registered Nurse for 22 years.  (Administrative Record 1 ("AR1") (ECF No. 18-1) at 1, 15; Administrative Record 2 ("AR2") at 120.)  Her role involved a "medium physical demand level" that included duties such as "assess[ing] patient health problems and needs, develop[ing] and implement[ing] nursing care plans, and maintain[ing] medical records.  Administer[ing] nursing care to ill, injured, convalescent, or disabled patients." (AR2 at 123.)  Plaintiff also "advise[d] patients on health maintenance and disease prevention or provide[d] case management."[1]  (*Id.*)

As a Dignity Health Employee, Plaintiff was a participant in an employee welfare benefit plan ("the Plan") which was funded by a group Policy (the "Policy") issued by Defendant.  (AR1 at 1, 25.)  Plaintiff was a member of Class AC for "[a]ll non-exempt Employees, excluding residents, working at Mercy General Hospital, Mercy San Juan Medical Center, and Methodist Hospital of Sacramento electing the 60.00% benefit option." (AR1 at 1, 30.)  Such employees were subject to two different definitions of "Disability" to qualify for benefits.  The first definition (the "own occupation" definition) applies "during the Elimination Period and the next 24 months of the Disability" when "the Covered Person, as a result of Injury or Sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way." (AR1 at 46.)  The Policy further defines "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began." (AR1 at 51.)  The second definition of

---

[1] This job description was provided by Defendant's vocational analysis for a "Direct Patient Care Nurse." (*Id.*)  Plaintiff does not dispute that this job description is inaccurate.

"Disability" (the "any occupation" definition) applies after the completion of the "Elimination Period and the next 24 months of Disability" and requires that:

> [T]he Covered Person is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engage with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, education, experience, station in life, and physical and mental capacity.

(AR1 at 46.)

Proof – defined as "written proof covering the occurrence, the character and the extent of the loss for which the claim is made" – of disability is required to receive long term benefits under the Policy.  (AR1 at 53, 67.)  Further, the Policy allows Defendant to have a claimant examined "as often as [Defendant] may reasonably require."  (AR1 at 87.)  Benefits may terminate under several circumstances, including on "the date the Covered Person is no longer Disabled according to this policy[.]" (AR1 at 78.)

## II.     Plaintiff's Disability

### A. Plaintiff's Medical History Prior to Filing the LTD Claim

Plaintiff ceased work on May 21, 2020, citing lupus, fibromyalgia, chronic pain, depression, and a lumbar herniated disc.  (AR1 at 15.)  In the months leading up to her final working day, Plaintiff visited primary care physician, Dr. Sayed Hussain ("Dr. Hussain")  for concerns related to iron deficiency and was referred to rheumatology and dermatology after reporting joint pain, a history of face/body rashes and fatigue. (AR2 222–23).  Two days before she ceased working, Plaintiff had a televisit with Dr. Hussain, where she reported "some confusion" and being "unable to concentrate" and explained that she was unable to work.  (AR2 at 368.)  She also reported "more back pain" which resulted in Dr. Hussain ordering an MRI.  (*Id.*)  During this visit, Dr. Hussain reported that Plaintiff was advised to be off work from May 15, 2020, until June 21,

2020. (*Id.*) After she stopped working, Plaintiff visited Dr. Hussain again and informed him that she had arthritic pain, "mental fogg[i]ness" and fatigue. (*Id.* at 373.) Dr. Hussain ordered that her disability be extended through July 12, 2020. (*Id.*) At her July 2020 visit, Plaintiff informed Dr. Hussain that she remained fatigued and experienced poor concentration and sciatic leg pain, and he extended her disability until August 10, 2020. (*Id.* at 377.) At the August 2020 visit, Plaintiff reported the same issues and Dr. Hussain extended her disability until September 8, 2020. (*Id.* at 284). In October 2020, Plaintiff had bloodwork reviewed by Dr. Hussain and he advised that Plaintiff be off work until December 12, 2020. (*Id.* at 391–94.)

Following through on her neurology referral, Plaintiff visited neurologist Valdimir Rafanov, M.D., ("Dr. Rafanov"). She reported an onset of joint pain, muscle aches, hand numbness, sensitivity to light, fatigue, and trouble focusing on conversations. (*Id.* at 358.) Plaintiff also reported that she was seeing a psychologist. (*Id.*) Dr. Rafanov assessed Plaintiff for fibromyalgia, prescribed her medications, and noted a negative brain MRI. (*Id.* at 353–54.)

Plaintiff was also referred to rheumatologist Dr. Robinder Dhillon. (*Id.* at 142.) At the visit, Plaintiff reported experiencing pain from head to toe daily since 2005, memory loss, dizziness, headaches and left ear ringing beginning in 2016. (*Id.*) Dr. Dhillon reported polyarthralgia, undifferentiated connected tissue disease, sleep disturbances, fibromyalgia, and mental confusion and continued Plaintiff on her medications. (*Id.* at 147–48.)

On November 12, 2020, Plaintiff informed Defendant that she was submitting a long-term disability benefits claim ("LTD claim") for disability due to symptoms related to lupus erythematosus, polyarthralgia and a herniated disc. (AR1 at 20.)

**B. Plaintiff's Own Occupation Disability**

Defendant approved Plaintiff's LTD claim under the "own occupation" definition on January 8, 2021. (AR2 at 31.) Plaintiff's date of disability was deemed May 21, 2020, with her benefits beginning on November 17, 2020. (*Id.*) The claim was

granted after Defendant conducted an initial interview, received an Attending Physician's Statement from Dr. Hussain, and an assessment from Lincoln Vocational Case Manager Megan Provost, and referred Plaintiff's file to a third party, NMR.

In the third-party review, NMR selected board-certified internal-medicine physician Dr. Alfred Becker ("Dr. Becker"), who reviewed Plaintiff's file and spoke with Dr. Hussain. (AR2 at 110.) Dr. Becker explained that Dr. Hussain found Plaintiff to suffer from diffuse osteoarthritic symptoms, and numerous symptoms of depression, memory loss, cognitive issues that would impinge on her ability to continue the work she does. (*Id.*) Dr. Becker also opined that while there were few clinical findings, he found support for low-level positive ANA and cervical osteoarthritic changes that "require[d] limitations and restrictions in the work environment." (*Id.*) This included a sedentary work environment, limited standing, walking and walking up staircases, a restriction on lifting, pushing, pulling 25 pounds occasionally, a restriction from kneeling, crouching, walking up ladders, or walking up unprotected heights, and restrictions from having to work with heavy machinery. (*Id.*) Dr. Becker found, however, that Plaintiff's sitting abilities were unrestricted. Nevertheless, given the "chronicity" of her restrictions, Dr. Becker stated that they were permanent in nature. (*Id.*)

In February 2021, after the approval of the LTD claim, Defendant sent Plaintiff an "Activities Questionnaire Form." (*Id.* at 32.) In this form, Plaintiff reported that she was able to walk on her treadmill for thirty minutes, do yoga, prepare meals, clean up after meals, read and watch television. (*Id.* at 78.) She also reported that she does not "feel good" when waking up "for a couple of hours." (*Id.* at 77.) In response to a question about what prevents her from engaging in "any gainful employment," Plaintiff reported "many health issues that are affecting" her ability to work. (*Id.*)

In September 2021, Plaintiff had a telephone call with physical therapist Bryce Cartwright for issues related to low back pain. (AR1 at 363.) Plaintiff was assessed as presenting with chronic worsening low back pain complicated with a history of lupus

resulting in functional limitations in walking, sleeping, sitting and leaning back. (*Id.* at 364.)  Plaintiff was anticipated to improve with skilled physical therapy programs.  In February 2022, Cartright reported that Plaintiff "tolerated treatment well" and "did well with the accuracy in the exercises" that they completed. (*Id.* at 453.)

In November 2021, Plaintiff also saw adult and family medicine Dr. Garry Guce, for reported neck pain. (AR1 at 383).  Dr. Guce assessed Plaintiff for neck pain, cervical radiculopathy and systemic lupus erythematosus. (*Id.* at 385–86.)  He also reported an "negative" review of systems and prescribed Prednisone and Tramadol. (*Id.* at 384.)  Plaintiff visited Dr. Guce again in March 2022, where he noted that Plaintiff had lupus within normal limits, with no active flare but still experienced mild joint pains and facial numbness. (*Id.* at 685.)  He also noted that Plaintiff was "doing well" on physical therapy and non-steroidal anti-inflammatory medication for pain complaints. (*Id.* at 683.)   In August 2022, Plaintiff reported migraines and Dr. Guce prescribed her Rizatriptan and ordered a brain MRI. (*Id.* at 565.)

### C.  Plaintiff's Any Occupation Disability

The definition of "Disability" under the Policy shifted after 24 months from the "own occupation" to "any occupation" standard. (AR1 at 637.)  At this time, Defendant referred Plaintiff's file to ECN, a third party, to select a board-certified physician to review the records and opine on Plaintiff's medically supported functionality. (AR1 at 658–59.)  ECN chose Reza Emami, M.D., who reviewed Plaintiff's medical history. (*Id.*)  Dr. Emami opined that Plaintiff suffers from "a medical condition of such severity to warrant the placement of restrictions and limitations on her activities from the time period of present. . .ongoing." (AR1 at 653.)  Dr. Emami also stated that "although it is recommended that claimant is unable to work due to the symptoms, [she] has no clinical findings of severity to concur with the recommendation of no work status." (*Id.* at 654.)  Rather, the lack of any documented loss of ability to use an extremity completely, significant neurological impairment, or loss of gait or mobility supported an accommodated, full-time work setting with appropriate restrictions and limitations.

6

(*Id*.)  Dr. Emami recommended limitations on standing, walking, lifting, carrying, pushing, pulling, reaching, simple and firm grasping, fine manipulation, and use of lower extremities for foot control, and restricted balancing, stooping, kneeling, crouching, and crawling.  (*Id.*)  However, he found that there were no restrictions needed for her sitting.

Based on Dr. Emami's assessment, Plaintiff's education, training, work history and earnings history, Vocational Rehabilitation Consultant Alicia Powell issued a Transferrable Skills Analysis.  (*Id.* at 643.)  Powell determined that based on her vocational expertise and labor market survey research, Plaintiff could perform the job of a "Nurse, Consultant."  (*Id.* at 644.)  This role was not identified during the OAYSYS search.  (*Id.* at 645.)

According to the Department of Labor's Dictionary of Occupational titles ("DOT")[2], the "Nurse, Consultant" occupation involves the following:

> Advises hospitals, schools of nursing, industrial organizations, and public health groups on problems related to nursing activities and health services. Reviews and suggests changes in nursing organizational and administrative procedures.  Analyzes nursing techniques and recommends modifications.  Aids schools in planning nursing curriculums, and hospitals and public health nursing services in developing and carrying out staff education programs.  Provides assistance in developing guides and manuals for specific aspects of nursing services. Prepares educational materials and assists in planning and developing health and educational programs for industrial and community groups.  Advises in services available through community resources.  Consults with nursing

---

[2] Plaintiff requests that this Court take Judicial Notice of the Department of Labor's Dictionary of Occupational Titles for the definition of "Nurse Consultant."  Defendant does not oppose this Request. When conducting de novo review, "the district court can consider extrinsic evidence only under certain limited circumstances, and only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Sund v. Hartford Life and Accident Ins. Co.,* No. 21-cv-05218-JST, 2023 WL 5181624, at *13 (N.D. Cal. Aug. 11, 2013).  Given that the "DOT has been recognized as a widely used and reasonable reference for administrators and courts to use under ERISA in order to conduct a vocational analysis," the Court considers the cited portions of the DOT description.  *Id.*

> groups concerning professional and educational problems.
> Prepares or furnishes data for articles and lectures.
> Participates in surveys and research studies.

(DOT Def. (ECF No. 16, Ex. A).)  Each occupation listed in the DOT is assigned three scores comprising the General Education Development scale required by the occupation: reasoning development, mathematical development and language development.  The Nurse Consultant role has a reasoning development score of 5, meaning that a person performing the occupation must "apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions.  Interpret an extensive variety of technical instructions in mathematical or diagrammatic form.  Deal with several abstract and concrete variables." (ECF No. 16, Ex. B.)   The role also has a mathematical development score of 4, which requires algebra, geometry and "shop math" skills.  (*Id.*)  Finally, the role has a language development score of 5, which requires the employee to have the intellectual capacity to read "scientific and technical journals, abstracts, financial reports, and legal documents."  (*Id.*)

Based on Dr. Emami's review and the findings of the Vocational Specialist, Defendant informed Plaintiff that she failed to meet the "any occupation" disability definition as of the November 17, 2022, change in definition. (*Id.* at 640–41.)  Plaintiff was informed that she may appeal the decision.  (*Id.* at 641.)  As part of such appeal, Plaintiff was asked to include "[p]roof of total disability from any occupation beyond November 16, 2022," among other documentation."  (*Id.*)

**III.    Plaintiff's Post-Termination Assessments**

Plaintiff appealed the Defendant's decision on December 29, 2022.  (AR1 at 618–20.)  Along with her appeal, Plaintiff submitted reports from Steven McCormick, Ph.D., and Brianna Durham, a physical therapist.  (*Id.*)  Both assessments were conducted after Plaintiff had her LTD claim denied under the "any occupation" definition.  (AR1 at 584, 606.)

### A. Dr. McCormick's Evaluation

On December 6, 2022, Stephen McCormick, Ph.D., conducted a neuropsychological evaluation on Plaintiff. (AR1 at 606.) In the report, Dr. McCormick stated that he reviewed 68 pages of medical records from Kaiser Permanente. (*Id.* at 607.) He also noted Plaintiff's subjective symptoms and then performed cognitive and psychological tests on Plaintiff. (*Id.* at 610–17.)

In his explanation of the cognitive test results, Dr. McCormick discusses eight internal performance validity procedures that were used to assess Plaintiff's motivation to perform on cognitive tests. (*Id* at 610.) Failing two or less of the performance measures indicates that the data obtained is likely valid for interpretation. (*Id.*) Dr. McCormick noted that Plaintiff failed one performance validity item and that Plaintiff's performance showed excessive inter individual variability, which suggests that the data may not be a valid representation of her actual functioning ability. (*Id.*)

Nevertheless, based on the results of the neuropsychological consult, Dr. McCormick concluded that "within reasonable medical probability" Plaintiff "is unable to work as a nurse or in any competitive employment position now and for the foreseeable future because of cognitive impairments and related psychological symptoms." (AR1 at 617.) In other words, "the results of cognitive tests were suggestive of impaired new verbal and visual learning." (*Id.*) These deficits, "cause severe limitation in performing all but the very basic life activities of daily living and impeding useful action in most daily social and interpersonal functioning." (*Id.*) In a work setting, Dr. McCormick opined that "these medical/psychological factors will cause slowed task competition errors, co-worker frustration and probable termination for poor job performance." (*Id.*)

### IV. Brianna Durham

Plaintiff also had a functional capacity evaluation ("FCE") conducted by physical therapist Brianna Durham, a physical therapist on November 18, 2022. (AR1 583–605.) Durham reviewed Plaintiff's medical records prior to the assessment. (*Id.* at

585.) She reported that Plaintiff gave maximum effort with testing, and that intra-test reliability is evident for the test. (*Id.*) This was based on Plaintiff's physical behaviors correlating with her subjective complaints of pain, an increase in overall heart rate during functional activities correlating with maximum effort during tasks. (*Id.*) The FCE included places where pre and post activity heart rate could be recorded. (*Id.* at 601–02.) Additionally, Plaintiff's score on the neck disability index indicated a moderate disability, and her score on the "SLUMS" exam indicated a mild cognitive disorder. (*Id.*) Based on the results, Durham concluded that "the [Plaintiff] is unable to sit for 2 hours continuous," which falls below sedentary and is "unable to work at this time, at any capacity." (AR1 585–86.)

### V.    Plaintiff's Appeal and Defendant's Final Determination

Plaintiff's appeal was handled by Janelle Paine, a Claim Resolution Specialist employed by Defendant who had not previously been involved with Plaintiff's claim. (AR1 at 303–04.) Paine referred the file to a third-party reviewer, ECN, for a neuropsychological review. (*Id.* at 300.) ECN selected Charles Golden, Ph. D., a board-certified neuropsychologist, for an assessment of Plaintiff's file. (*Id.* at 285.)

Dr. Golden reviewed Plaintiff's medical records and concluded that "the medical evidence does not support any diagnosis causing functional impairment from 11/16/2022 through the present and ongoing." (*Id.* at 288.) He noted Plaintiff's "documented history of depression and cognitive complaints," but explained that Plaintiff's psychiatric and neuropsychological evaluation did not assess any psychiatric diagnosis or definite neurocognitive disorder such that they would impair her occupational functioning. (*Id.* at 287–89.) Dr. Golden also minimized Dr. McCormick's findings based on the one failed performance measure and the excessive inter individual variability. (*Id.* at 289–90.) He ultimately recommended that Plaintiff is able to sustain full time capacity within identified restrictions and limitations. (*Id.* at 289.)

Paine also referred the claim to NMR, a different third-party reviewer, for an independent medical examination. (*Id.* at 283.) NMR selected Dr. Scott Anderson,

board-certified in rheumatology, internal medicine, allergy and clinical immunology, who reviewed Plaintiff's medical records and met Plaintiff in April 2023. (*Id.* at 202.) Dr. Anderson noted that Plaintiff moved and ambulated without assistive devices and moved easily into his office. (*Id.* at 228.) Based on the physical examination and record review, Dr. Anderson concluded that Plaintiff "does not appear have a diagnosis in the field of Rheumatology that would explain functional impairments from November 16, 2022, to the present time." (*Id.* at 227.) He stated that he did not find evidence of systemic lupus erythematosus, mixed connective tissue disease, undifferentiated connective tissue disease or other lupus variant conditions. (*Id.*) As a result, Dr. Anderson concluded that from a Rheumatology standpoint, Plaintiff could perform her job duties without restrictions. (*Id.*) Defendant shared Dr. Golden and Dr. Anderson's findings with Plaintiff's counsel and provided an opportunity to provide additional information for Defendant's consideration. (*Id.* at 3.) Plaintiff disputed Dr. Golden and Dr. Anderson's medical conclusions but did not provide additional documentation for consideration. (*Id.* at 2.)

On June 9, 2023, Defendant informed Plaintiff of the decision to uphold the appeal of the termination of benefits. (*Id.* at 112–22.) The letter concluded that Plaintiff could perform the "Nurse, Consultant" occupation and rejected Plaintiff's evidence to the contrary as insufficient. (*Id.*) In particular, it discussed the lack of any updated medical records since September 23, 2022, and the lack of additional medical information to contradict Dr. Golden and Dr. Anderson's findings. (*Id.* at 117–18.) As for Dr. McCormick's findings, Defendant noted that Plaintiff failed one performance validity item and that her performance showed excessive inter individual variability, which suggested that the data may not be a valid representation of her actual functioning ability. (*Id.* at 115.) Additionally, Defendant stated that Plaintiff had no diagnosis of a definite neurocognitive disorder, reported the ability to perform several leisure activities and activities of daily living, which would be inconsistent with impaired cognitive or psychiatric functioning, and had not undergone any additional

cognitive assessment or scheduled neuropsychological re-evaluation. (*Id.* 115–16.) Turning to the FCE, Defendant stated that the FCE can be limited by the participating individual's level of effort and/or desire to engage in the tested activities. (*Id.* at 118.) Defendant found it notable that Plaintiff's evaluation with Dr. McCormick demonstrated excessive inter individual variability and found it "possible the FCE could have also seen a presentation in excess of her physical abilities." (*Id.*) Thus, Defendant concluded that Plaintiff's proof of continuing disability from "any occupation" as of the change in definition date failed, and Plaintiff's appeal was denied. (*Id.* at 119–20.)

## CONCLUSIONS OF LAW

### I.    Legal Standards

This action is governed by ERISA. *See Metro. Life Ins. Co. v. Taylor,* 481 U.S. 59, 63 (1987). ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro Life Ins. Co. v. Glenn,* 554 U.S. 105, 108 (2008). Typically, district courts review a plan administrator's denial of benefits under a *de novo* standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here, the Parties agree that a *de novo* standard of review applies. (Def. Mot. at 18; Plaintiff Mot. at 13.)

On *de novo* review, an ERISA administrator's decision receives no deference. *Muniz v. Amec Const. Mgmt., Inc.,* 623 F.3d 1290, 1295–96 (9th Cir. 2010). Rather, the court performs an "independent and thorough inspection" of the matter. *Silver v. Exec. Car Leasing Long-Term Disability Plan,* 466 F.3d 727, 733 (9th Cir. 2006). It then "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan,* 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014).

The plan participant bears the burden of proving her entitlement to benefits. *Muniz,* 623 F.3d at 1294. Since the burden rests with the claimant, "the court must examine whether the participant has established, by a preponderance of the

evidence, that the record supports the conclusion that [s]he is entitled to benefits under the policy." *Louis v. Hartford Life & Accident Ins. Co.,* No. 2:19-cv-00056-MJP, 2020 WL 39145, at *7 (W.D. Wash. Jan. 3, 2020) (citing *Muniz,* 623 F.3d at 1294, 1296). "The mere existence of an impairment is insufficient proof of a disability. . .[a] claimant bears the burden of proving that an impairment is disabling." *Matthews v. Shalala,* 10 F.3d 678, 680 (9th Cir. 1993) (citations and internal quotation marks omitted).

## II.    Analysis

Plaintiff's claim is for the recovery of benefits under the Policy pursuant to ERISA, codified at 29 U.S.C. § 1132(a)(1)(B).  As such, the central issue is whether Plaintiff has demonstrated, by a preponderance of the evidence, that she suffers from a physical or cognitive limitation preventing her from performing sedentary work as a Nurse Consultant as of November 17, 2022.

The "any occupation standard is not demanding."  *McBurnie v. Life Ins. Co. of N. Am.,* 763 F. App'x 596, 598 (9th Cir. 2019), (citing *McKenzie v. Gen. Tel. of Cal.,* 41 f.3d 1310, 1317–18 (9th Cir. 1994), *overruled on other grounds by Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863 (9th Cir. 2008).  Under this standard, "it is sufficient to show that an employee has the capacity to perform some job for which she is qualified or can reasonably become qualified."  *Id.*  Here, Defendant determined that Plaintiff was capable of working as a "Nurse, Consultant" and thus denied the continuation of her LTD benefits.

### A. Cognitive Limitations

Plaintiff first contends that Defendant's decision to revoke her LTD benefits fails because she has established, by a preponderance of the evidence, that she suffers from cognitive impairments that would compromise her ability to meet the requirements of the "Nurse, Consultant" role.  To support this argument, Plaintiff points primarily to Dr. McCormick's findings.  Defendant contests the credibility of Dr. McCormick's assessment because he was hired by Plaintiff, because his examination

revealed that Plaintiff failed to pass all of the validity measures, and because he did not reconcile his conclusions with Plaintiff's contemporaneous medical records.

Neither party disputes that Plaintiff failed one of the eight validity measures but rather dispute what significance should be attributed to the results of his examination. To explain the failed validity measure, Plaintiff points to the Eleventh Circuit's decision in *Sisung v. Unum Life Ins. Co. of America,* 2022 WL 1772273 (11th Cir. 2022).  There, the court reviewed a district court's finding that the defendant life insurance company had a reasonable basis for denying plaintiff's long-term disability benefits.  *Id.* at *1.  In discussing whether plaintiff had demonstrated cognitive limitations, the Eleventh Circuit noted that the only relevant medical testing on this matter was an evaluation that plaintiff submitted with her appeal.  *Id.* at *5.  The defendant ultimately rejected the neuropsychological evaluation as entirely invalid based, in part, on Plaintiff's borderline score on one measure of validity for memory impairments.  *Id*.  The court reasoned that even though the borderline score may indicate exaggeration as to memory impairment, it was not reasonable to discard all the results where Plaintiff had passed several other validity measures.  *Id.*  The plaintiff also had inconsistent personality and mental illness responses, but the court noted that Plaintiff never claimed to have such issues such that the inconsistencies were not dispositive.  *Id.* Moreover, the court noted that the plaintiff's ability to perform daily tasks was not inconsistent with finding that she could not perform her occupation.  *Id.*

As in *Sisung,* it appears that Dr. McCormick's assessment is the most relevant analysis of Plaintiff's cognitive condition.  Because there is no argument as to the legitimacy of Dr. McCormick's methodology, the Court does not dispose of Dr. McCormick's assessment as entirely unreliable, although the failed validity measure and inter individual variability go to the weight to be given his assessment.  That weight is based on "(i) the extent of the patient's treatment history; (ii) whether the examining physician specializes in the condition at issue; and (iii) how much detail the examining physician provides to support his conclusions."  *Filarsky v. Life Ins. Co. of N.*

14

*Am.,* 391 F. Supp. 3d 928, 940 (N.D. Cal. 2019).  "A physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional limitations."  *Doe v. Life Ins. Co. of N.A.,* No. 5:24-cv-00859-NW, 2026 WL 125617, at *12 (N.D. Cal. Jan. 15, 2026) (citation omitted).  Where the treating physician's records do not adequately support the diagnosis, their opinion may be deemed "particularly unreliable."  *Shaw v. Life Ins. Co. of N.A.,* 144 F. Supp. 3d 1114, 1130 (C.D. Cal. 2015).  "Under such circumstances, a paper review by a physician retained by the plan administrator may be more reliable than the opinion of a treating physician."  *Id.*

Here, Dr. McCormick conducted an in-person neuropsychological evaluation of Plaintiff once in December 2022.  (AR1 at 606.)  He is a neuropsychologist who holds a Ph.D. and there is no argument challenging his expertise.  In conducting his evaluation, Dr. McCormick reviewed 68 pages of medical records from July 18, 2022, through November 1, 2022.  (*Id.* at 607.)  He performed a series of cognitive and psychological tests and detailed Plaintiff's results.  Dr. McCormick concluded that the cognitive tests may not be a valid representation of Plaintiff's actual functional abilities, but the result of his psychological test indicated that Plaintiff likely underreported her psychological symptoms. (*Id.* at 617.)  Dr. McCormick concluded that "within reasonable medical probability that [Plaintiff] is unable to work as a nurse or in any competitive employment position now and for the foreseeable future because of cognitive impairments and related psychological symptoms." (*Id.*)  The "synergistic effects" of her health conditions "have led to a functional memory disorder with cognitive psychological symptoms that cause severe limitation in performing all but the very basic activities of daily living and impeding useful action in most social and interpersonal functioning." (*Id.*)  He further states that "[i]n a work setting these medical/psychological factors will cause slowed task completion and errors, co-worker frustration and probable termination for poor job performance."  (*Id.*)

15

Plaintiff also argues that Dr. Golden's report supports her claim. Dr. Golden indicated that Plaintiff had an "exceptionally low range of verbal and visual learning/recall," as well as "borderline range in perceptual reasoning," with "noticeably lower performance in verbal fluency and auditory naming." (AR1 131.) Dr. Golden ultimately disagreed with Dr. McCormick's conclusion that Plaintiff lacked work capacity because of the failed validity measure and inter individual variability. (*Id.* at 132.)

Even so, the record in this case contains documentation of depression, mental fogginess, and short-term memory that Plaintiff reported to her treating physicians. (*Id.* at 288.) In as early as 2020, Plaintiff reported to Dr. Hussain, her treating physician, that she experienced confusion, and an inability to concentrate. (AR2 at 368.) She also reported mental fogginess, and was proscribed Wellbutrin and later, Cymbalta. (AR1 at 288.) Additionally, in conducting the assessment for Plaintiff's "own occupation" disability determination, Dr. Becker reported that "Dr. Hussain explained that the [Plaintiff] has . . . numerous symptoms of depression, memory loss, [and] cognitive issues that would impinge on the kind of work that she does." (AR2 at 114.) Finally, there are consistent reports in the record of Plaintiff's concerns about migraines and visual/spatial issues. The fact that Plaintiff did not obtain the level of mental health treatment that Defendant felt would have been appropriate under the circumstances also does not minimize her subjective reports of her abilities. *See Salmoaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 678–79 (9th Cir. 2011) ("Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established until autopsy. . .[i]n neither case can a disability insurer condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible.").

16

Overall, the Court finds that Dr. McCormick's findings are supported by the record. Thus, the Court finds that Plaintiff has established, by a preponderance of the evidence, that she is unable to perform the "Nurse, Consultant" role.

**B. Physical Limitations**

Plaintiff next argues that she has demonstrated, by a preponderance of the evidence, a physical disability rendering her disabled under the "any occupation" definition. Plaintiff points primarily to the FCE in November 2022, which concluded that Plaintiff was unable to sit for two hours continuously, thereby making her unable to work at any capacity. (AR1 at 586.) Defendant argues that Plaintiff's FCE is unreliable and cannot support her claim.

As an initial matter, Defendant may not present new rationales for denial of benefits in litigation. *Collier v. Life Ins. Co. of Boston,* 53 F. 4th 1180, 1187 (9th Cir. 2022). This does not mean that "a plan administrator need [ ] address every piece of evidence submitted by a participant in support of a claim for benefits." *Id.* at 1188. Rather, a "district court cannot adopt post-hoc rationalizations that were not presented to the claimant, including credibility-based rationalizations, during the administrative process." *Id.*

Here, Defendant addressed the FCE in the final claim determination letter as follows:

> Kindly note, a functional capacity evaluation ("FCE") can be limited by the participating individual's level of effort and/or desire to engage in the tested activities. As such, an FCE may be skewed by an individual's self-reported limitations and motivations. In Ms. Dever's case it is notable that the December 6, 2022, neuropsychological evaluation showed her performance was suggestive of excessive inter individual variability, which suggested the data may not be a valid representation of her actual functioning ability. If Ms. Dever's neuropsychological evaluation may have had reports in excess of her symptomology, it is possible the FCE could have also seen a presentation in excess of her physical abilities.

17

(AR1 at 118.)  Although the Court does not find the Defendant's argument about Plaintiff's performance in the neuropsychological examination compelling, because the reliability of the FCE was challenged in the final determination letter, it may review the record to determine whether that is the case.  Defendant challenges the FCE for its lack of objective validity testing, and its reliance instead on "inherently self-limited 'testing' stemming" from plaintiff's internally consistent results.  (Def. Mot. at 19.)  Although courts rely on FCEs as reliable measures of a claimant's disabilities, *see Dunham-Zemberi v. Lincoln Life Assurance Co. of Boston,* 629 F. Supp. 3d 1220, 1232 (S.D. Fl. Sept. 2022) (collecting cases), that finding often involves some corroboration through validity measures and/or findings in the record.

Here, the Court does not discount the FCE's findings but notes that it does not appear to include objective validity measures that would demonstrate reliability.  The FCE relies heavily on Plaintiff's self-reported tolerances and did not document many physiological response changes in conjunction with Plaintiff's performance.  Plaintiff had her pre-activity heart rate recorded in all instances, but many of the spaces for the post-heart rate activity do not appear to be recorded.  *See Paff v. Lincoln Life Assurance Co. of Boston,* No. 1:23-cv-01414-DJN, 2024 WL 4368976, at *6 (E.D. Va. Oct. 2024) (describing that a FCE's notable lack of validity testing diminishes the weight that the court affords it, as does the overreliance on the plaintiff's reported tolerances).  This is particularly salient where record indicates that Plaintiff can perform sedentary work at the level required for the "Nurse, Consultant" role.  *See Stratton v. Life Ins. Co. of N.A.,* 589 F. Supp. 3d 1145, 1176 (S.D. Cal. Mar. 2022) (affording significant weight to two FCEs which were consistent with the plaintiff's treating physician for over three years' opinions).  Notably, Dr. Becker found that while Plaintiff was limited in her working capacity, her sitting abilities were unrestricted.  Dr. Emami also found that while Plaintiff was subject to certain limitations her ability to sit was unrestricted.  Additionally, Dr. Hussain "felt that a sedentary job description could be tolerated."  Plaintiff did report concerns about pain from prolonged sitting to Bryan

Cartwright, but following that report, Dr. Guce indicated that pain medication and physical therapy "work[ ] well." (AR1 at 683.)

On this record, the Court finds that Plaintiff has failed to establish, by a preponderance of the evidence, that she is physically unable to meet the "any occupation" disability definition.

## CONCLUSION

While Plaintiff has not demonstrated functional limitations that would meet the any occupation definition of disability, Plaintiff has proven, by a preponderance of the evidence, that her cognitive limitations would prevent her from performing the Nurse Consulting role, the only potential employment identified by Defendant. Accordingly, the Court GRANTS Plaintiff's Motion for Judgment (ECF No. 16) and DENIES Defendant's Motion for Judgment (ECF No. 17).  Accordingly, the Court OVERTURNS Defendant's claim decision denying Plaintiff LTD benefits and finds that Defendant owes Plaintiff LTD benefits from November 17, 2022, to the present, with prejudgment interest at the statutory rate.

The Clerk of Court is directed to close this case and enter judgment in favor of Plaintiffs.

IT IS SO ORDERED.

Dated:   **March 31, 2026**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC6 – DEVER24cv02435.mj_v1

19